## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| HUGUES GERVAT, derivatively on behalf of UiPATH, INC., | |
| Plaintiff, | **Case No.:** |
| v. | |
| DANIEL DINES, ASHIM GUPTA, PHILIPPE BOTTERI, CARL ESCHENBACH, MICHAEL GORDON, DANIEL SPRINGER, LAELA STURDY, JENNIFER TEJADA, and RICHARD P. WONG, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| UiPATH, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Hugues Gervat ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant UiPath, Inc. ("UiPath" or the "Company"), files this Verified Shareholder Derivative Complaint against Daniel Dines ("Dines"), Ashim Gupta ("Gupta"), Philippe Botteri ("Botteri"), Carl Eschenbach ("Eschenbach"), Michael Gordon ("Gordon"), Daniel Springer ("Springer"), Laela Sturdy ("Sturdy"), Jennifer Tejada ("Tejada"), and Richard P. Wong ("Wong") (collectively, the "Individual Defendants," and together with UiPath, the "Defendants"), for and among other things, breaching their fiduciary duties to UiPath, unjust enrichment, abuse of control gross mismanagement, waste of corporate assets, violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b-

1

5 promulgated thereunder, and for contribution under Sections 10(b) and 21D of the Exchange Act.

As for Plaintiff's complaint against Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding UiPath, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought against the members of UiPath's Board of Directors (the "Board"), several UiPath officers, and UiPath's controlling shareholder for their breaches of fiduciary duty, violations of the federal securities laws, and other misconduct, which occurred between April 21, 2021 and March 30, 2022 (the "Relevant Period"), and which resulted in substantial damage to UiPath and its stockholders.

2.     UiPath is a global developer and provider of robotic process automation ("RPA") software. RPA software is a technology that mimics the activity of a human being to complete repetitive digital tasks. UiPath's website claims that RPA "streamlines workflows, which makes organizations more profitable, flexible, and responsive. It also increases employee satisfaction, engagement, and productivity by removing mundane tasks from their workday." UiPath describes

its product as "industry-leading" and represents that it is an "end-to-end" solution that enables users to build and manage their automations in the fashion they deem best.

3.      The Company has three reportable revenue segments. The first, licenses, consists of fees generated from the sale of software licenses, which are typically offered on annual or multi-year terms. UiPath recognizes the revenues from its license sales at the time when a customer is able to use and benefit from the Company's software. This typically occurs when the software is delivered to the customer, or when the customer renews his or her existing Company software license. The second segment is known as maintenance and support, or subscription services revenue. Revenue from this segment consists of fees generated from technical support services provided to customers and is recognized over the term of the arrangement. Lastly, the Company's "services and other" revenue segment consists of fees generated from services rendered to customers, such as process automation, customer education, and customer training. Revenue from this segment is recognized when the services are performed.

4.      UiPath generates the majority of its revenues from the sale of software licenses.  In fiscal year 2021, UiPath earned approximately $340 million in license revenue, representing approximately 57% of the Company's total revenues.[1]

5.      The Company employs a relatively unique definition of annualized renewal run-rate ("ARR"), which it instructs investors to focus on as especially indicative of the Company's success. The Company considers ARR to be annualized invoice amounts per solution stock keeping unit ("SKU") from subscription licenses and maintenance obligations while assuming no increases or reductions in customer subscriptions. As a result, the income that UiPath purportedly

---

[1] UiPath's fiscal year ends on January 31 of the calendar; so, for example, UiPath's fiscal year 2022 ended on January 31, 2022.

anticipates from a particular contract is more evenly distributed over an annualized period as compared to ordinary revenue recognition practices, which, as is the case with the Company's license sales, are recognized upon delivery and thus may result in more variability. Of note, ARR does not reflect any actual or anticipated reductions in invoiced value due to contract non-renewals or service cancelations other than for specific bad debt or disputed amounts. UiPath also publicly reports Net New ARR, which represents incremental growth of ARR during a particular quarter relative to the prior quarter.

6.     The Company depends on a direct sales team to generate sales. Sales are comprised of three segments: (i) enterprise sales, which focuses on large businesses and public sector organizations; (ii) high-velocity inside sales, which focuses on high volume midsized customers; and (iii) global strategic sales, which focuses on the largest strategic accounts. In addition to the direct sales team, UiPath relies substantially on external partnerships with systems integrators, regional developers, business process outsourcing providers, and distributors to drive sales in markets where UiPath has a smaller direct sales presence. UiPath's partnership agreements are generally non-exclusive and do not prohibit partners from working with UiPath's competitors or from recommending competing products.

7.     As a result of lockdowns, worker shortages, and remote work mandates brought about by the COVID-19 pandemic, demand for automation software, including RPA software, increased in 2020 as businesses sought to mitigate various logistical and financial setbacks. The automation industry was therefore widely viewed as a burgeoning industry. Despite this increase in demand, the Company claimed that it had not experienced a requisite increase in business. On this point, during a September 7, 2021 earnings call, Defendant Dines stated, "We always said that

COVID was net neutral for us. We've seen some business industries accelerating, [we've seen] some deceleration in other industries."

8.      As the demand for automation software increased, enterprise software providers such as Microsoft, IBM, Oracle, and Salesforce were prompted to ramp up their investment in the automation market. For example, in May 2020, Microsoft announced it had acquired Softomotive, a robotic process automation company, to help jumpstart Microsoft Power Automate, which was Microsoft's existing process automation offering. While UiPath had, to that point, been considered the industry leader in automation software, Microsoft's acquisition of Softomotive expanded Microsoft's "low-code" automation capabilities, allowing Microsoft to offer automation with relatively greater ease of use.  In addition, the ubiquity of Microsoft's enterprise software enabled Microsoft, like certain other large scale office software providers, to bundle its automation software within its broader suite of enterprise software for lower prices.

9.      Throughout the Relevant Period, however, Defendants claimed that Microsoft was not a significant competitor with UiPath, as UiPath purportedly offered enterprise automation solutions while Microsoft offered products primarily focused on enhancing individual user capabilities. Rather than portray Microsoft as a major rival, defendants emphasized Microsoft's status as a valuable business partner that offered complimentary products and assisted in the sale of UiPath products and services.

10.      On April 21, 2021, the beginning of the Relevant Period, the Company went public through its  initial public offering ("IPO"). The Company's IPO was structured so as to allow Board members and Company insiders to sell their shares shortly after the IPO was completed and therefore not be subjected to a customary 180-day lock-up period. As a result, both prior and subsequent to the IPO, Defendants were able to artificially inflate the Company's share price,

thereby maximizing their profits upon dumping their shares. This scheme was ultimately successful, as Company insiders sold *18,853,999 shares of Company common stock to the tune of $1.055 billion in total returns following the IPO*.[2]

11.     Throughout the Relevant Period, Defendants claimed that UiPath was experiencing exceptional growth and was competitively positioned to continue robust growth trends into the future. For example, on June 8, 2021, Defendant Dines assured investors in a press release that the Company's "exceptionally strong" ARR growth was the result of the Company's superior products and a "testament to our leadership position in enterprise software automation."

12.     However, these and similar statements made by defendants during the Relevant Period were materially false and misleading. In actuality, UiPath products had a smaller addressable market than Defendants portrayed. In addition, UiPath was losing market share to established enterprise software vendors such as Microsoft, IBM, and Salesforce who were capable of bundling their low-code automation products into their enterprise software suites, lessening the need for add-on automation software. Compounding the problem, UiPath began to compete with its own integration systems partners, which strained these critical relationships and prompted the Company's partners to divert business to UiPath's competitors, in particular Microsoft.

13.     The truth began to emerge on September 7, 2021, when UiPath announced its quarterly results for the second quarter of fiscal year 2022, revealing a dramatic slowdown in the growth of the Company's revenue and ARR metrics.

14.     Then, on March 30, 2022, the truth fully emerged when the Company issued its financial results for the quarter and year ended January 31, 2022, which were lower than expected revenue numbers and represented shrinking year-over-year growth. Additionally, the report

---

[2] All emphasis added, unless otherwise noted.

provided disappointing ARR and revenue guidance for the Company for the fiscal year 2023, with the numbers reported coming in well below analysts' expectations.

15.      On this news, UiPath's common stock fell from $29.04 per share on March 30, 2022 to $21.59 per share on March 31, 2022, a decline of $7.45 per share, or more than 25%, on above-average trading volume.

16.      Throughout the Relevant Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (1) the Company had implemented a substantial discounting program prior to its IPO, which temporarily boosted UiPath's revenue and ARR metrics, cannibalized its future sales, eroded UiPath's margins, and increased the risk of client churn; (2) the Company's actual total addressable market was not as large as portrayed by Defendants, as many companies included in the market survey did not need the type of high-cost, high-functionality automation products that UiPath offered; (3) the Company was losing customers to competitors, including Microsoft, ServiceNow, SAP, Salesforce, IBM, and other established enterprise software vendors that were integrating automation into their existing platforms; (4) the Company was losing customers because of the increased availability of low-code automation software offered by vendors, such as Microsoft's Power Automate software, which were capable of addressing the majority of customer use cases at a fraction of the price of UiPath's products and services; (5) the Company was suffering from a loss of channel sales due to strained relationships with its partners as a result of increased competition between UiPath and these partners; (6) the Company failed to maintain internal controls; and (7) as a result of the foregoing, Defendants' statements about the Company's

business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

17.     Moreover, throughout the Relevant Period, Defendants also made materially false and/or misleading statements which failed to disclose, *inter alia*, that: (1) the Company's "ramping" model for contracts and Defendants' directions to investors to focus on the ARR metric created a materially misleading impression of client demand for UiPath's products and its revenue and ARR growth metrics, as the lower initial contract commitment induced certain customers to sign up with the Company who would not pay for larger commitments as the contracts ramped in later time periods; and (2) part of the reason the Company employed this "ramping" contract model was UiPath's inability to sign up customers for longer-term engagements without substantial discounting.

18.     The Individual Defendants further breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material facts, while, during the Relevant Period, five of the Individual Defendants sold Company shares at artificially inflated prices for combined total proceeds of over $504 million.

19.     Additionally, Individual Defendants caused the Company substantial harm by causing it to repurchase its own shares at artificially inflated prices. In total, the Company spent an aggregate amount of ***over $10.5 million*** to repurchase approximately 185,932 shares of its own common stock at artificially inflated prices from April 2021 to March 2022. In total, this caused the Company to overpay for repurchases of its own stock by over $6.55 million.

20.     In light of the Individual Defendants' misconduct—which has subjected the Company, its former Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO")

to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein— the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

21.    In light of the Individual Defendants' breaches of fiduciary duties, most of whom are the Company's current directors, the collective engagement in fraud and misconduct by the Company's directors, the substantial likelihood of the directors' liability in this derivative action, the officers' and directors' liability in the Securities Class Action, and the fact that they are not disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## **JURISDICTION AND VENUE**

22.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

23.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

25.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, UiPath is incorporated in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

26.     Plaintiff is a current shareholder of UiPath. Plaintiff has continuously held UiPath common stock at the time of the alleged wrongdoing.

27.     UiPath is a Delaware corporation with principal executive offices at One Vanderbilt Avenue, 60th Floor, New York, New York 10017. UiPath's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "PATH."

28.     Defendant Dines is the co-founder of UiPath and has served as Chairman of the Board since October 2005.Since May 2022, Dines has served as Co-CEO of the Company. Additionally, Defendant Dines served as the Company's CEO from 2015 to 2022. According to the Schedule 14A the Company filed with the SEC on April 28, 2023 (the "2023 Proxy Statement"), as of April 18, 2023, Defendant Dines beneficially owned 27,011,840 shares of Class A Common Stock, representing 5.6% of all of the Company's Class A Common Stock issued. Additionally, as of that date, Defendant Dines beneficially owned 82,452,748 shares of Class B Common Stock, representing 100% of all Class B Common Stock issued. Defendant Dines's ownership grants him 86.6% of total voting power at the Company, making him the controlling shareholder of UiPath. Given that the price per share of the Company's Class A Common Stock at

the close of trading on April 18, 2023 was $15.95, Defendant Dines owned approximately $430.8 million worth of UiPath stock as of that date. For the fiscal year ended January 31, 2023 (the "2023 Fiscal Year"), Defendant Dines received $771,835 in total compensation from the Company.

29.     Defendant Gupta has served as the Company's CFO since November 2019. According to the 2023 Proxy Statement, as of April 18, 2023, Defendant Gupta beneficially owned 750,281 shares of Class A Common Stock. Given that the price per share of the Company's Class A Common Stock at the close of trading on April 18, 2023 was $15.95, Defendant Gupta owned approximately $12 million worth of UiPath stock as of that date. For the 2023 Fiscal Year, Defendant Gupta received $15,646,662 in total compensation from the Company.

30.     Defendant Botteri has served as a Company director since February 2020. As a member of the Board, Defendant Botteri serves on the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of April 18, 2023, Defendant Botteri beneficially owned 60,974,155 shares of Class A Common Stock. Given that the price per share of the Company's Class A Common Stock at the close of trading on April 18, 2023 was $15.95, Defendant Botteri owned approximately $972.5 million worth of UiPath stock as of that date. For the 2023 Fiscal Year, Defendant Botteri received $226,039 in total compensation from the Company.

31.     Defendant Eschenbach served on the Board from March 2021 before resigning effective March 7, 2023. While on the Board, Defendant Eschenbach served on the Audit Committee. For the 2023 Fiscal Year, Defendant Eschenbach received $226,039 in total compensation from the Company.

32.     Defendant Gordon has served as a Company director since September 2020. He also serves as Chair of the Audit Committee. According to the 2023 Proxy Statement, as of April

18, 2023, Defendant Gordon beneficially owned 131,384 shares of Class A Common Stock. Given that the price per share of the Company's Class A Common Stock at the close of trading on April 18, 2023 was $15.95, Defendant Gordan owned approximately $2.1 million worth of UiPath stock as of that date. For the 2023 Fiscal Year, Defendant Gordon received $226,039 in total compensation from the Company.

33.    Defendant Springer has served as a Company director since March 2021. Defendant Springer also serves as a member of the Compensation Committee and the Audit Committee. According to the 2023 Proxy Statement, as of April 18, 2023, Defendant Springer beneficially owned 55,738 shares of Class A Common Stock. Given that the price per share of the Company's Class A Common Stock at the close of trading on April 18, 2023 was $15.95, Defendant Springer owned approximately $889,021 worth of UiPath stock as of that date. For the 2023 Fiscal Year, Defendant Springer received $226,039 in total compensation from the Company.

34.    Defendant Sturdy has served as a Company director since March 2021. Defendant Sturdy also serves as a member of the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of April 18, 2023, Defendant Sturdy beneficially owned 19,383 shares of Class A Common Stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 18, 2023 was $15.95, Defendant Sturdy owned approximately $309,159 worth of UiPath stock as of that date. For the 2023 Fiscal Year, Defendant Sturdy received $233,539 in total compensation from the Company.

35.    Defendant Tejada served as a Company director from October 2020 before resigning effective April 11, 2023. Prior to her resignation, Defendant Tejada served as the Chair of the Nominating and Corporate Governance Committee. For the 2023 Fiscal Year, Defendant Tejada received $226,039 in total compensation from the Company.

36.     Defendant Wong has served as a Company director since March 2018. Defendant Wong also serves as Chair of the Compensation Committee. According to the 2023 Proxy Statement, as of April 18, 2023, Defendant Wong beneficially owned 60,547,299 shares of Class A Common Stock. Given that the price per share of the Company's Class A Common Stock at the close of trading on April 18, 2023 was $15.95, Defendant Wong owned approximately $965.7 million worth of UiPath stock as of that date. For the 2023 Fiscal Year, Defendant Wong received $241,039 in total compensation from the Company.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

37.     By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of UiPath and because of their ability to control the business and corporate affairs of UiPath, the Individual Defendants owed UiPath and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage UiPath in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of UiPath and its shareholders so as to benefit all shareholders equally.

38.     Each controlling shareholder, director and officer of the Company owes to UiPath and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

39.     The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors and/or officers of UiPath, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

40.    To discharge their duties, the controlling shareholder, officers, and directors of UiPath were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

41.    Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of UiPath, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of UiPath's Board at all relevant times.

42.    As controlling shareholder, senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants, including Defendant Dines as a controlling shareholder, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to

disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

43.     To discharge their duties, the controlling shareholder, officers and directors of UiPath were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of UiPath were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, and the United States, and pursuant to UiPath's own Global Code of Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how UiPath conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of UiPath and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that UiPath's operations would comply with all

15

applicable laws and UiPath's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

44.    Each of the Individual Defendants further owed to UiPath and the shareholders the duty of loyalty requiring that each favor UiPath's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

45.    At all times relevant hereto, the Individual Defendants were the agents of each other and of UiPath and were at all times acting within the course and scope of such agency.

46.    Because of their advisory, executive, managerial, directorial, and controlling positions with UiPath, each of the Individual Defendants had access to adverse, non-public information about the Company.

47.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by UiPath.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

48.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

49.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (1) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (2) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (3) artificially inflate the Company's stock price.

50.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of UiPath was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

51.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the

17

commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

52.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of UiPath and was at all times acting within the course and scope of such agency.

## THE CODE OF CONDUCT

53.     According to the Code of Conduct, the Code of Conduct "is applicable to all employees, freelancers, those employed by carriers or other contingent workers acting on Behalf of UiPath [], as well as the Company's business partners."

54.     The Board represents that it adopted the Code of Conduct to "ensure that at all times all employees, freelancers, those employed by carriers or other contingent workers acting on behalf of UiPath or having access to UiPath systems including its subsidiaries and affiliates… act in good faith, with integrity and consistent with the Company's values in order to maintain effective trust and credibility with our employees, customers, business partners and communities in which we operate."

55.     In a section titled "Speak Up," the Code of Conduct states, "If you become aware of any circumstances that you have a good faith reason to believe are inconsistent with or in violation of this Code of Conduct, you have a responsibility to report such conduct[.]"

56.     The Code of Conduct includes a section titled "Financial Disclosures," which states, in relevant part:

> UiPath is required to maintain accurate financial books and records reflecting the true nature of UiPath's operations and finances. Falsification of company business

documents is expressly prohibited. Any employee who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly to a supervisor, the Compliance Officer, the Audit Committee of the Board, or by raising the concern on the Compliance Hotline as described below under the "Speak Up" section.

57.     In a section titled "Avoid Conflicts of Interest," the Code of Conduct states the following, in relevant part:

> UiPathers shall not engage in any conflicts of interest stemming from any personal activities or relationships that influence or may be perceived to influence one's decision-making and ability to work in the best interests of UiPath. UiPathers must disclose, amongst other things, personal financial interests or investments, personal relationships, outside employment or engagements, membership in professional and political organizations, as well as excessive gifts or hospitalities.

58.     In a section titled "Disclosure of Inside Information," the Code of Conduct states the following:

> As a UiPather, you may be privy to confidential information of UiPath or its customers or partners that may provide you or anyone to whom you disclose such information an unfair financial advantage as it pertains to the purchasing or selling of equity in such companies. The use of such inside information with respect to purchasing or selling equity is unlawful and may lead to civil and/or criminal liability.

## CORPORATE GOVERNANCE GUIDELINES

59.     The Company also maintains Corporate Governance Guidelines. With respect to the responsibilities of the Board, the Corporate Governance Guidelines state the following:

> A director should discharge his or her duties, including duties as a member of any committee on which he or she serves, in good faith and in a manner the director reasonably believes to be in the best interests of the Company and its stockholders. Board members will comply with the laws and requirements of the Exchange and other applicable regulatory agencies and with all policies and guidelines of the Company, including without limitation, the Company's Global Code of Conduct.

> Each director is expected to disclose promptly to the Board and respond promptly and accurately to periodic questionnaires or other inquiries from the Company regarding any existing or proposed relationships with the Company, including compensation and stock ownership, which could affect the independence of the director. Each director will also promptly inform the Board of any material change in such information, to the extent not already known by the Board.

Board members are expected to devote sufficient time and attention to prepare for, attend, and participate in Board meetings and meetings of committees on which they serve, including advance review of meeting materials that may be circulated prior to each meeting.

60.    Additionally, the Corporate Governance Guidelines emphasize that the Board must

not utilize confidential information for personal benefit, stating the following:

Directors may not use such confidential information for personal benefit or to benefit other persons or entities other than the Company. Unless authorized by the Company or applicable law, directors will refrain from disclosing confidential information to anyone outside the Company, especially anyone affiliated with any entity or person that employs the director or has sponsored the director's election to the Board. These obligations continue even after service on the Board has ended. The confidentiality obligations described above continue even after service on the Board has ended. Any questions or concerns about potential disclosures should be directed to the Company's General Counsel and Chief Legal Officer, who then may communicate with the Chief Executive Officer(s) or the Nominating Committee regarding the potential disclosures.

61.    In a section titled "Role of the Board of Directors," the Corporate Governance

Guidelines state:

Stockholders select directors to provide oversight and strategic guidance to senior management. A director's responsibility is to fulfill his or her fiduciary duties of care and loyalty, and otherwise to exercise his or her business judgment in the best interests of the Company and its stockholders. Board service requires significant time and attention. More specifically, the Board has responsibilities to review, approve, and monitor fundamental financial and business strategies and significant corporate actions, assess the Company's major risks, and consider ways to address those risks, select and oversee management, and establish and oversee processes to maintain the Company's integrity. To fulfill their duties, directors must prepare for meetings and discussions with management, participate in Board meetings, review relevant materials, and serve on committees. The Company expects directors to maintain an attitude of constructive involvement and oversight, ask relevant and incisive questions, and demand honest and accurate answers. Directors must act with integrity and demonstrate a commitment to the Company, the Company's values, business, and long-term stockholder value.

62.    In violation of the Code of Conduct and the Corporate Governance Guidelines, the

Individual Defendants (as controlling shareholder, key officers and members of the Company's

Board) conducted little, if any, oversight of the Company's engagement in the Individual

Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Sections 10(b), 20(a), and Rule 10b-5 promulgated thereunder of the Exchange Act.

63.     In further violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Moreover, five of the Individual Defendants violated the Code of Conduct by engaging in insider trading.

## AUDIT COMMITTEE CHARTER

64.     The Company also maintains an Audit Committee Charter. Under a section titled "Purpose," the Audit Committee Charter states the following:

- oversee the Company's accounting and financial reporting processes, systems of internal control, financial statement audits and the integrity of the Company's financial statements;
- manage the selection, engagement terms, fees, qualifications, independence, and performance of the registered public accounting firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors");
- maintain and foster an open avenue of communication with the Company's management, internal audit group and Auditors;
- review any reports or disclosures required by applicable law and stock exchange listing requirements;
- oversee the design, implementation, organization and performance of the Company's internal audit function;
- help the Board oversee the Company's legal and regulatory compliance, including risk assessment; and
- provide regular reports and information to the Board.

65.     In a section titled "Authority," the Audit Committee Charter states the following, in relevant part:

The Committee will have access to all Company books, records, facilities and personnel as deemed necessary or appropriate by any member of the Committee. If the Committee concludes that it must retain legal, accounting or other outside advisors, it may do so and determine compensation for those advisors at the

21

Company's expense. The Committee may also pay any ordinary administrative expenses it deems appropriate in carrying out its duties at the expense of the Company. The Committee will have authority to require that any of the Company's personnel or outside advisors attend any meeting of the Committee or meet with any member of the Committee or any of its advisors.

66.     In violation of the Audit Committee Charter, Defendants Gordon and Springer failed to adequately review and discuss the Company's annual and quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct.

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading
### Statements Issued During the Relevant Period

67.     The Relevant Period begins on April 21, 2021. On that date, UiPath filed with the SEC a Prospectus on Form 424B4 (the "Prospectus") in connection with its IPO. The Prospectus highlighted UiPath's purportedly robust growth rate, stating in pertinent part as follows:

> We have experienced rapid growth.  Our ARR was $351.4 million and $580.4 million in the fiscal years ended January 31, 2020 and 2021, respectively, representing a growth rate of 65%.  We generated revenue of $336.2 million and $607.6 million, representing a growth rate of 81%, and a net loss of $519.9 million and $92.4 million in the fiscal years ended January 31, 2020 and 2021, respectively.

68.     The Prospectus further emphasized UiPath's commitment to achieving "hyper growth," stating in pertinent part as follows:

> In fiscal year 2020, we continued to make investments that enabled our hypergrowth and market capture, and began to focus on realizing the operational leverage inherent in our business model and customer economics.  In fiscal year 2021, we continued our focus on demonstrating the operational leverage in our business model, while prioritizing investments that will allow us to continue to achieve best-in-class growth and business scale and to capitalize on our significant market opportunity.

69.     The Prospectus also emphasized UiPath's revenue growth, stating in pertinent part as follows:

> Total revenue increased by $271.5 million, or 81%, for the fiscal year ended January 31, 2021 compared to the fiscal year ended January 31, 2020, primarily due to an increase in our licenses revenue of $144.4 million, an increase in our maintenance and support revenue of $112.9 million and an increase in services and other revenues of $14.2 million. Approximately 75% of the increase in revenue was attributable to growth from existing customers, and the remaining increase in revenue was attributable to new customers. As we continued to expand our sales efforts in the United States and internationally, our increase in total revenue was consistent across all regions.

70.     On June 8, 2021, UiPath issued a release announcing its financial results for the quarter ended April 30, 2021 (the "1Q22 Release"). The 1Q22 Release stated that UiPath had achieved ARR of $652.6 million during the quarter, representing a 64% year-over-year increase. The 1Q22 Release further stated that UiPath had earned revenues of $186.2 million during the quarter, representing a 65% year-over-year increase. The 1Q22 Release quoted Defendant Dines, who attributed UiPath's "'exceptionally strong'" ARR growth to the superiority of UiPath's products, stating that the growth was "'a testament to our leadership position in enterprise software automation.'" The 1Q22 Release also quoted defendant Gupta, who stated: "'We have experienced rapid growth and now have over 8,500 customers worldwide, including 1,105 customers with ARR of $100,000 or greater and 104 customers with ARR of $1 million or greater.'"

71.     That same day, Defendants Dines and Gupta hosted a conference call with analysts and investors to discuss the Company's financial results. On the call, Defendant Dines emphasized UiPath's "record" ARR growth, stating that "[o]ur leadership position in the RPA market is again demonstrated by our ARR growth…. We continue to grow multiples of the market and take market share."

72.     On the same call, Defendant Gupta highlighted that UiPath was experiencing "meaningful growth at scale" which he attributed to the Company's competitive advantage. In particular, Defendant Gupta stated "And as our results underscore, we are consistently winning these competitive evaluations…." Additionally, he stated: "[T]he opportunity in front of us is enormous and growing. Our strong first quarter results and guidance reflect the growing momentum in our business and the power of our automation flywheel."

73.     In response to an analyst's question regarding his expectations for the rest of the year, Defendant Gupta noted the Company's "pipeline continue[d] to be strong." Defendant Gupta stated in full:

> I just want to start by emphasizing the strength of our quarter. $653 million of ARR and a record quarter of incremental ARR breaking $70 million at $72 million total incremental ARR. When you look at that growth, it was really founded on the fact *that we're continuing to add customers at a really fast pace*. So our customer count is now greater than 8,500 customers. That's up more than 600 sequentially and 2,4000 year-over-year. Quite frankly, *this has exceeded our expectations*, and we're looking forward as *our pipeline continues to be strong*.

74.     In response to a question about the "competitive threat" posed by Microsoft, Defendant Dines downplayed Microsoft as a competitor and assured investors that UiPath was "beat[ing]" out all competition based on its "very differentiated" technology, stating in pertinent part as follows:

> I would start by saying that we are very differentiated, first of all, in our philosophy towards automation.  We have a unique platform that aims to emulate people and their work.  Microsoft has built a low-code/no-code platform whose main goal is to provide new applications and analytics to the people.  *They are like comparing apples to oranges.*
>
> *Our approach is extremely difficult to replicate*.  It requires a huge experience curve that we have built over the last 15 years.  Our platform is a combination of UI, API and computer vision AI, that is, again, extremely difficult to replicate and it is our secret sauce.

Moreover, I would say that our differentiations come from the 3 major directions. First of all, we have this unique end-to-end horizontal platform that is really necessary to win in this space. And this is a space that is about the highest return on investment and the fastest time to value that I've seen almost ever in the world of enterprise software. We are in a business where we can improve the return of investment. And that was very beneficial throughout our history.

We consistently have proven, and we have beaten our competitors with our technology. If you go there and if you can show that you are able to implement in half time, imagine the exponential return on investment that happens when you deploy at scale. ***And by the way, we're a technology that is proven to deploy at scale, while I would say that Microsoft's approach has not tested large-scale deployments***.

75.     Additionally, Defendant Gupta noted that the Company's pipeline was "enrich[ed]" by gaining market share from its competitors. Defendant Gupta furthered:

[W]e continue to feel in the discussions here the TAM $60 billion dollars is real, every single industry, every single department, every single process, every single employee. ***We see that enrich in really the pipeline of what we look at. So you can see also customers migrating away from our competitors and to us***. And that is not just necessarily just about the strength of our individual components, but that is ***the strength of our entire platform***.

76.     The next day, June 9, 2021, the Company filed a quarterly report on Form 10-Q with the SEC for the quarter ended April 30, 2021 (the "Q1 22 Form 10-Q"), which was signed by Defendants Dines and Gupta. Attached to the Q1 22 Form 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Dines and Gupta attesting to the accuracy of the financial statements in the Q1 22 Form 10-Q and the effectiveness of the Company's internal control over financial reporting. The Q1 22 Form 10-Q contained the financial information provided in the 1Q22 Release.

77.     The statements identified above in ¶¶ 67-76 were materially false and/or misleading when made because they failed to disclose, *inter alia*, that: (1) the Company implemented a substantial discounting program prior to its IPO, which resulted in temporarily boosting UiPath's revenue and ARR metrics, cannibalizing its future sales, eroding UiPath's margins, and increasing

the risk of client churn; (2) the Company's actual total addressable market was not as large as Defendants portrayed, as many companies included in the market survey did not need the type of high-cost, high-functionality automation products that UiPath offered; (3) the Company was losing customers to competitors, including Microsoft, ServiceNow, SAP, Salesforce, IBM, and other established enterprise software vendors that were integrating automation into their existing platforms; (4) customers were leaving UiPath because of the increased availability of low-code automation software offered by vendors, such as Microsoft's Power Automate software, which were capable of addressing the majority of customer use cases at a fraction of the price of the Company's products and services; (5) the Company was suffering from a loss of channel sales due to strained relationships with its partners as a result of increased competition between UiPath and these partners; (6) the Company failed to maintain internal controls; and (7) in light of the above, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

78.     On September 7, 2021, UiPath issued a press release announcing the Company's financial results for the quarter ended July 31, 2021 (the "2Q22 Release"). The 2Q22 Release revealed a surprising slowdown in UiPath's revenues and ARR metrics. In particular, the 2Q22 Release represented that UiPath's "Net new ARR of $73.9 million increased 33 percent year- over-year." This was down from the 55% reported growth in the first quarter. The 2Q22 Release further revealed that the Company's leading license revenue category had fallen from 57% year-over-year in the prior quarter to just 20% in the current quarter.

79.     The 2Q22 Release further claimed that UiPath had achieved an ARR of $726.5 million during the second quarter of fiscal year 2022, which represented a 60% year-over-year growth. The 2Q22 Release also stated that UiPath earned revenues of $195.5 million during the

quarter, representing a 40% year-over-year increase. The 2Q22 Release quoted Defendant Gupta who attributed the Company's incremental ARR growth to UiPath's "competitive differentiation," stating:

> The team executed well this quarter as ***we continue to drive meaningful growth at scale.*** Our land and expand go-to-model delivered record net new ARR, ***a testament to our competitive differentiation*** and the power of our platform to drive meaningful return on investment for our customers. Looking ahead, our priority is to continue to drive growth while exercising operational rigor, ***which will allow us to maintain our clear leadership position in this large and growing market.***

80.     Also on September 7, 2021, the Company held an earnings conference call with investors to discuss its financial and operating results for the second quarter of fiscal year 2022. On the call, Defendant Gupta revealed that the Company had implemented a substantial discounting policy for its products prior to the IPO and further explained how the Company was shifting to a "ramping" strategy, whereby customer contracts would start small with incremental increases over time. This new strategy was intended to reduce the need for UiPath to offer extensive discounting to its customers, as it had prior to its IPO. Defendant Gupta furthered, "Looking at our pipeline, which is strong across geographies, ***we see the opportunity to move customers to deal structures with annual ramping, which we expect will lower our overall discounts.***"

81.     Later on the call, an analyst asked for additional information regarding UiPath's decision to move away from its previously-utilized extensive discount pricing. In response, Defendant Gupta stated:

> Billings duration is down, and that is because we've deemphasized prepaid deals given our cash position and our gross retention rate. So when your gross retention rate is 98%, ***we don't feel compelled to trade any type of discount for long for getting cash in the door right today.*** We're able to make better and better economic decisions from the position of strength.

82.     Also during the call, Defendant Dines emphasized that the growth in the Company's customer base was representative of a high market "demand for automation." Defendant Dines stated:

> As of the end of the second quarter, our customer base was more than 9,100. ***And the number of our customers who are leveraging our platform to accelerate automation is growing quickly***. We have 1,247 customers that accounted for at least $100,000 in ARR, up 59% from 785 in the second quarter of last year. This includes 118 customers at $1 million-plus in ARR, up 100% from 59. ***These numbers demonstrate not only the significant demand for automation, but demand for automation at scale.***

83.     Further, in response to an analyst's question, Defendant Dines denied that the end of the pandemic was causing demand for UiPath's platform to wane, stating "As we are getting, hopefully, in the last phase of COVID, we see solid demand in – for our technology, for our platform. We are seeing quite a solid pipeline for the second part of the year."

84.     Defendant Gupta agreed with Defendant Dines and added:

> I look at the long-term demand signals that we see. Daniel talked about the strength of our pipeline. ***We love our competitive position***. The awareness in the market around our platform is higher than ever, as you can see from a lot of the industry reports that have also come out. ***So we actually feel very positive about the long-term demand coming out of COVID.***

85.     In response to another analyst's question about the volatility in the Company's reported net new ARR metrics, Defendant Gupta emphasized to investors that the Company's pipeline had "grown" and remained "very strong." In particular, he stated the following:

> Look, I look at our incremental ARR numbers, the net new ARR that we've been posting, we're very pleased with it. It reflects the investment. It reflects both the strong dollar base – the impact of the strong dollar-based net retention rate as well as the steady execution of new logos. We continue to invest in our sales force.
>
> So as we continue to bring up our sales team and ramp up additional reps, which we've been doing, ***I feel very good about the overall trajectory to fulfill the pipeline that we have in front of us, which has grown and is very strong.***

86.     During the call, Defendant Dines characterized the Company's technology as its "winning angle" and rejected claims that the Company was experiencing pressure from competitors. In relevant part, Defendant Dines stated the following:

> So we all know this is a big market growing quickly, and automation is the central piece of the digital transformation. So obviously, all major players in the cloud and the business applications are in our space.
>
> ***
>
> So Salesforce is seeing a consolidation between low-code/no-code integration and automation. And this is exactly what we have told the market for a long time, and we have expanded into these areas for a long time. With this big release in the fall, you should expect really a smooth integration of our Cloud Elements acquisition that was done in the beginning of this year. So we will make a very well-oiled machine around automation with low-code/no-code that we have introduced a year or something ago. And now we're really combining UI automation and API automation in a very good integrated package.
>
> **We believe that our angle towards this consolidated platform is our angle that comes from emulating people is really the one -- that is the winning angle**. All these small acquisitions made me think that still the big software players don't understand how difficult it is to build emulation software.
>
> **This is our bread and butter**. We have built it for a long time. And starting from this angle, we – **it gives us a tremendous opportunity to extend our reach to the entire consolidated automation space.**

87.     Further, Defendant Gupta emphasized that the Company's ramping strategy would result in "long-term engagement," thereby boosting profit margins. He explained the following, in relevant part:

> **This structure creates better ROI for our customers, long-term engagement opportunities for our partners and will yield better overall margins for UiPath. It is also positive for ARR growth, which is our most important metric**, but it can create short-term revenue variability due to the timing of license delivery and GAAP revenue recognition.

88.     Defendant Gupta also emphasized, in response to an analyst's question, that the Company's revenue growth would likely accelerate in later years because of how the ramping

model was structured, resulting in additional robot deliveries to customers later in contracts. He explained the following:

> So what that means is instead of buying simple annual contracts, what we see a larger demand for is getting larger-term commitments from some of our customers. ***But the way they look at that is instead of buying 10,000 robots today, they may buy 1,000 robots today, 5,000 next year, 10,000 in year 3. And those – the license*** deliveries would happen into those years as we go down.
>
> ***
>
> And if there's any confusion on ramp, remember what I mean is you can buy robots of 100 per year for a 3-year deal or you can buy robots of 100, 200, 300 in a deal. ***And then the licenses for that additional 100 per year gets delivered in subsequent years. [W]hich is why there is – why that creates variability in terms of revenue recognition.***

89.    On September 8, 2021 the Company filed with the SEC a quarterly report on Form 10-Q for the quarter ended July 30, 2021 (the "Q2 22 Form 10-Q"), which was signed by Defendant Gupta. Additionally, attached to the Q2 22 Form 10-Q were SOX certifications signed by Defendants Dines and Gupta attesting to the accuracy of the financial statements in the Q2 22 Form 10-Q and the effectiveness of the Company's internal control over financial reporting. The Q2 22 Form 10-Q contained the same financial information as the Company provided in the 2Q22 Release.

90.    The Company's drastically slower growth rate in 2Q22 resulted in the price of the Company's common stock falling from $62.46 per share on September 7, 2021 to $54.50 per share on September 9, 2021, representing a decline of more than $8 per share, or more than 12%, on above-average trading volume.

91.    On October 14, 2021, Defendants Dines and Gupta presented at the Morgan Stanley Spark Conference on behalf of the Company. During the conference, Defendant Gupta was asked how UiPath had derived its $60 billion total addressable market. Defendant Gupta responded by

confirming that number and claiming that the figure had been verified by a variety of means, stating the following:

> *So we actually triangulated it multiple ways and independently verified as well. So we've quantified the market at $60 billion-plus.* And we did it very simply. We took our customer base, segmented our companies by the number of employees because that's relatively correlated to complexity and number of processes that are there. We took the top 10% of our customers and said, if every customer in the market could reach these levels of our top 10%, you do that simple math and you get to this number of $60 billion plus in terms of a total available market.
>
> Qualitatively, when you look at it, I live the TAM because I was a customer. So it was the only piece of software, when I was a CFO or a CIO, that could solve problems for legal, HR, finance, supply chain. So it's really relevant to every single department, every single process and every single employee. *When you look at it both qualitative and quantitatively, you can see the massive market that it really is.*

92.     Later in the presentation, the Defendants were once again asked whether Microsoft posed a competitive threat to UiPath. Defendant Dines responded that "Microsoft doesn't even compete" with the Company's core offerings and posed little overall competitive threat, stating:

> So--and I have high respect for Microsoft, especially under Satya. It's a great company. And we don't compete really with Power Platform. Power Platform, it's a big animal. We compete within – not even with Power Automate, really. Within this big platform, we compete with a product called Power Automate Desktop, which Microsoft bought 18 months ago from a Greek company. It's a product that was never really proven in large enterprise deployments. It's something that Microsoft sees more like in a personal productivity gain.
>
> So now, if you look at our business, how it is today, we have unattended space, we have attended space. For unattended space, you need a professional tool to – for professional developers. *This is not – Microsoft doesn't even compete in this space. We've never seen them in a competitive situation for unattended robots. So this is half of our business.*
>
> Now when you speak about attended automation, what this citizen developer tool that Microsoft has competes only for like 1 in 10 of the use cases out there. But what is even more important, when you go head-to-head in terms of products, Microsoft's strategy, at least until now, is to build something that works well within Microsoft ecosystem, like in-app type of automation. Microsoft Power Automate Desktop doesn't work well with SAP, with Salesforce, with ServiceNow. So it works within Microsoft Office technologies.

***But these are very few use cases, low-value use cases****.* In most of the processes that we are automating, we are seeing like 3 more, 3-plus different types, big categories of applications. So at this point, in reality, I think people are more scared about what Microsoft can do in our space than it's really the reality.

And there is also something that is very specific about this technology, which is not specific in case of Tableau or in case of Slack. This is an enterprise technology that generates huge return on investment. License pricing, if you use the technology that costs you $5 million a year and you generate $100 million in return on investment a year, would you take a technology that cost you $1 million and will generate only $20 million? I don't think.

So it's a very – and we can make a very simple return on investment, total cost of ownership, time to value. It's kind of easy because look, when you go to a customer and I – and they go to automation, they have to do something meaningful and measurable. So we have the – use Power Automate, use UiPath, automate this process, put whoever you want to automate and if they see – Microsoft sometimes can struggle 3 weeks to do something we can deliver in 2 hours. We've built this for many years. It's not an easy technology to build. So then the return-on-investment case, it's so clear.

93.     Additionally, Defendant Dines received questions about competition from other enterprise software providers who had begun to develop automation features to their native program suites, which he once again dismissed as insubstantial, stating:

***Servicetrace. At least until this point, we really don't compete with ServiceNow or Salesforce. We simply don't compete with them at this point****.* And to me, what they built, it's kind of they sprinkle an RPA term, but buying some kind of cheap companies. And it's mostly used for like in-app automation, which like in the case of Microsoft, this is – this doesn't have too much legs to go over.

So we – in case of ServiceNow, it's also [an] even more stark[] difference between our go-to-markets. They are primarily an IT shop. We sell primarily to business lines, to CFO, to operations. So I see clearly that it's not conflicting. We are actually customers to each other, we and ServiceNow. So we more partner than compete. We don't compete right now at this point in time.

94.     The statements identified in ¶¶ 78-93 were materially false and/or misleading when made for substantially the same reasons as mentioned in ¶ 77. Moreover, these statements were materially false and/or misleading when made because they failed to disclose that: (1) the

Company's "ramping" model for contracts and Defendants' directions to investors to focus on the ARR metric created a materially misleading impression of client demand for UiPath's products and its revenue and ARR growth metrics, as the lower initial contract commitment induced certain customers to sign up with the Company who would not pay for larger commitments as the contracts ramped in later time periods; and (2) part of the reason the Company employed this "ramping" contract model was UiPath's inability to sign up customers for longer-term engagements without substantial discounting.

95.     On December 8, 2021, the Company issued a press release announcing its financial and operating results for the quarter ended October 31, 2021 (the "3Q22 Release"). The 3Q22 Release revealed that the Company's growth had continued to stall. In particular, the 3Q22 Release disclosed that the Company's ARR annual growth rate during the quarter had declined for the third quarter in a row to 58%, and that the Company's net new ARR remained at 42% growth year-over-year, a substantial drop off from the 55% growth reported in the 1Q22 Release.

96.     On December 8, 2021, the Company held an earnings conference call with analysts and investors to discuss its financial results for the quarter ended October 31, 2021. On the call, Defendant Gupta provided further information about the Company's transition to the ramping method, stating the following:

> And then in terms of the question around duration, billings duration will continue to contract for us, and we've talked about this multiple times in terms of just our focus now with the cash in the bank that we are going to prioritize more 1-year deals and reduce our dependency on multiyear prepaid deals from a cash flow standpoint. That trend continued in the quarter.

97.     On this news, the price of the Company's common stock fell from $47.71 per share on December 8, 2021 to $44.05 per share on December 10, 2021. This represented a decline of more than $3 per share, or more than 7%, on above-average trading volume. Yet, in spite of this,

the Company's common stock continued to be artificially inflated as a result of the Defendants' material misstatements and omissions that concealed the full truth of the Company's business, operations, and financial results.

98. The 3Q22 Release quoted Defendant Dines in part: "This increasing awareness of the power of our end-to-end automation platform coupled with strong execution by our team resulted in fiscal third quarter ARR of $818 million, an increase of 58 percent year-over-year[.]" Additionally, the 3Q22 Release revealed that the Company had achieved revenues of $220.8 million during the quarter, which was representative of a 50% year-over-year increase. Defendant Gupta was quoted as saying "I am pleased with our third quarter fiscal 2022 results as ARR grew 58 percent and trailing twelve-month revenue grew 57 percent year-over-year, once again demonstrating our market leadership."

99. During the December 8, 2021 earnings conference call, Defendant Dines emphasized to investors and analysts that the Company was experiencing "considerable demand" for its platform. He added:

> In summary, we had a strong Q3, and we continue to drive growth at scale. ***The market is very healthy, and we see considerable demand for our automation platform***. I feel very good about what we have been able to accomplish across the business since our IPO, and we remain focused on innovation and our customers, which we believe is key to our ongoing success.

100. Later on the call, Defendant Dines reaffirmed this previous sentiment. He stated, "Yes. It's – we are very pleased with what we are seeing in front of us. We are seeing a strong Q4. It's – the demand is there. We are seeing really very engaged partners. So overall, we are very pleased with the direction where our business is going."

101. On the same call, Defendant Gupta once again highlighted the supposed strength of UiPath's pipeline, stating:

> *The opportunity in front of us is enormous. We have a strong pipeline*, and we feel very good heading into the end of our first fiscal year as a public company. We are building a truly multigenerational company that will change how people experience work. This is what excites us and motivates the team every day. It also keeps our focus on the long-term value creation for our employees, customers, partners and stockholders.

102.    In response to an analyst's question, Defendant Dines declared UiPath as the "clear leader" among automation providers and downplayed any claims of increasing competition, stating:

> In the last quarter, *we have not seen any material moves in terms of the competitive landscape*. And I would start by pointing to the first IDC MarketScape report that put us in a very clear leadership position. *And I would quote them saying that when it comes to real enterprise automation, real scaled enterprise automation, customers are choosing UiPath.*
>
> And this is, of course, because we offer an end-to-end platform that is suitable from small use cases to the most complex use cases. And indeed, we have this tapestry that we believe it's what helps our customers drive adoption from the process discovery, which is becoming really a driver of growth and helping the adoption, to building automation for both professional developers and citizen developers to strong analytic platforms and to our engagement layer, which is basically our low code, no code app platform, which is really dedicated to automation and integration use cases.
>
> So I would finish my answer saying that automation is really becoming a critical piece of accelerating digital transformation. *We are the clear leader. And we continue to win deals in very large scores because of our technology and our platform.*

103.    Defendant Dines was asked more pointedly about the competitive threat that Microsoft posed to the Company, to which he once again assured investors that Microsoft had no "*meaningful impact*" on the Company's "*ability to win customers*." He stated:

> In terms of real enterprise traction, *UiPath is really the only tangible choice for* enterprises that want to go from small to complex across different divisions that want a really high level of penetration.
>
> *Our own data, if we take into account the deals where Microsoft is participating versus the deals where Microsoft is not participating, we are not seeing material changes in our winning rate. So right now, currently, I can say Microsoft has –*

***doesn't have a meaningful impact on our ability to win customers.***

What is going to happen in the next couple of years? First of all, I would like to make a case that Microsoft is focused with their RPA, mostly on citizen developer and personnel productivity. This is a small part of our overall TAM. ***So I don't see that in the coming years, Microsoft investment and competing with us will materially derail us from our growth trajectory that we are seeing and we are building right now.***

104.    On December 10, 2021, the Company filed a quarterly report on Form 10-Q with the SEC for 3Q 2022 (the "Q3 22 Form 10-Q"). The Q3 22 Form 10-Q was signed by Defendants Dines and Gupta. Additionally, attached to the Q3 22 Form 10-Q were SOX certifications signed by Defendants Dines and Gupta attesting to the accuracy of the financial statements in the 3Q 22 Form 10-Q and the effectiveness of the Company's internal control over financial reporting. The Q3 22 Form 10-Q contained the financial information provided in the 3Q22 Release.

105.    The statements identified in ¶¶ 95-104 were materially false and/or misleading when made for substantially the same reasons as mentioned in ¶ 77. Moreover, these statements were materially false and/or misleading when made because they failed to disclose that: (1) the Company's "ramping" model for contracts and Defendants' directions to investors to focus on the ARR metric created a materially misleading impression of client demand for UiPath's products and its revenue and ARR growth metrics, as the lower initial contract commitment induced certain customers to sign up with the Company who would not pay for larger commitments as the contracts ramped in later time periods; and (2) part of the reason the Company employed this "ramping" contract model was UiPath's inability to sign up customers for longer-term engagements without substantial discounting.

### The Truth Fully Emerges

106.    The truth fully emerged on March 30, 2022 when the Company issued a press release detailing its financial and operating results for the quarter and year ended January 31, 2022

(the "4Q22 Release"). The 4Q22 Release revealed that the Company had earned revenues of only $289.7 million for the quarter, which represented a year-over-year increase of 39%. Moreover, the 4Q22 Release disclosed disappointing ARR and revenue guidance for the fiscal year 2023, indicating that the declining growth trends the Company was experiencing were expected to continue. In particular, the Company projected that first quarter 2023 ARR would be in the range of $960 million to $965 million and that fiscal 2023 ARR would be in the range of $1.2 billion to $1.21 billion. Likewise, the Company projected 2023 revenue to be in the range of $223 million to $225 million and fiscal 2023 revenue to be in the range $1.075 billion to $1.085 billion. All of these figures came in well below the consensus among analysts.

107.    That same day, the Company filed with the SEC a separate release on Form 8-K in which it announced the departure of Thomas Hansen ("Hansen"), the Company's Chief Revenue Office. In his role, Hansen was responsible for developing the Company's relationships with current and prospective customers and played a large role in sustaining the Company's partnership network and community. The release further revealed that the Company was hiring Chris Weber, a former Microsoft Executive, to serve as the Company's Chief Business Officer. In this new role, Weber would be responsible for taking charge of the Company's global market strategies, with oversight on the Company's worldwide sales, services, and go-to-market operations.

108.    During the corresponding conference call, Defendant Gupta attributed the expected slowdown in ARR growth to microeconomic factors, disruptions caused by the transition in sales leadership, uncertainty surrounding large deals, and the slowdown of European development as the result of the war in Ukraine.

109.    On this news, the price of the Company's common stock fell from $29.04 per share on March 30, 2022 to $21.59 per share on March 31, 2022, representing a decline of $7.45 per

share, or more than 25%, on above-average trading volume.

110.   Following the news, analysts who cover the Company described both the ARR and revenue outlook as "disappointing." For example, a BMO Capital Markets analyst reported that they were "surprised by the magnitude of the guidance change" and noted that even with the war and macroeconomic issues, the newly issued guidance "suggests ARR growth is expected to decelerate to ~35% y/y." Similarly, analysts at Summit Insights Group noted that the Company was losing market share to its competitors, all of whom were offering lower cost alternatives bundled with already popular software. Particularly shocking was Summit Insight Group's observation that ***Microsoft Power Automate provides 80% of the functionality of UiPath's products but at less than half the price.***

111.   By the first quarter of the fiscal year 2023, the Company's net new ARR would decline by more than 50%, dropping to just $51.8 million. As such, UiPath's revenue growth rate slowed ***every quarter*** beginning from the third fiscal quarter of 2022 until the fourth fiscal quarter of 2023. It eventually fell to just 7% year-over-year growth in the fourth fiscal quarter of 2023, indicating that the Defendants' promises that the new ramp up strategy would increase future sales had not come to fruition.

112.   On April 27, 2022, the Company announced that it was bringing on Robert Enslin ("Enslin") to serve as Co-CEO along with Defendant Dines. On September 7, 2022, during an earnings conference call, Enslin admitted to investors that Microsoft's competitive offerings substantially impacted the Company's ability to market products to clients. Enslin added that Microsoft "certainly does have an impact on how we sell and how we position ourselves in certain companies. And that's also the reason why we have to position the platform and get the branding right for the platform." These statements by Enslin stood in stark contrast to representations by

Defendants Dines and Gupta who falsely misled investors into believing that the Company was not in competition with Microsoft.

113.    Since the end of the Relevant Period, the Company's stock has declined 75% below the highest mark in the Relevant Period, resulting in significant damages to UiPath and its shareholders.

### Insider Trading During the Relevant Period

114.    During the Relevant Period, while the Company's stock price was artificially inflated, and before the scheme was exposed, Defendant Dines made the following sales of Company stock:

| Date | Shares | Price | Value |
|---|---|---|---|
| April 23, 2021 | 1,383,168 | $56.01 | $77,457,408 |
| November 12, 2021 | 20,964 | $56.39 | $1,182,097 |
| November 16, 2021 | 16,993 | $56.01 | $951,726 |
| November 17, 2021 | 7,785 | $56.07 | $1,182,097 |
| **Total:** | **1,428,910** | | **$80,027,728** |

115.    Thus, in total, before the fraud was exposed, he sold 1,428,910 shares of Company stock on inside information, for which he received approximately $80,027,728 in proceeds. Defendants Dines' insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

116.    During the Relevant Period, while the Company's stock price was artificially inflated, and before the scheme was exposed, Defendant Gupta made the following sales of Company stock:

| Date | Shares | Price | Value |
|---|---|---|---|
| August 24, 2021 | 26,404 | $62.00 | $1,637,048 |
| September 8, 2021 | 20,000 | $56.10 | $1,122,000 |
| November 4, 2021 | 40,000 | $56.48 | $2,259,280 |
| December 10, 2021 | 111,250 | $43.74 | $4,865,630 |
| January 3, 2022 | 24,546 | $43.27 | $1,061,982 |
| **Total:** | **222,200** | | **$10,945,940** |

117.    Thus, in total, before the fraud was exposed, he sold 222,200 shares of Company stock on inside information, for which he received approximately $10,945,940 in proceeds. Defendant Gupta's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

118.    During the Relevant Period, while the Company's stock price was artificially inflated, and before the scheme was exposed, Defendant Botteri made the following sales of Company stock:

| Date | Shares | Price | Value |
|---|---|---|---|
| April 23, 2021 | 5,219,883 | $56.00 | $292,313,448 |
| April 23, 2021 | 94,503 | $56.00 | $5,292,168 |
| August 16, 2021 | 163,539 | $60.18 | $9,841,613 |
| August 17, 2021 | 37,326 | $60.07 | $2,242,023 |
| August 18, 2022 | 73,784 | $60.27 | $4,447,256 |
| **Total:** | **5,589,035** | | **$314,136,508** |

119.    Thus, in total, before the fraud was exposed, he sold 5,589,035 shares of Company stock on inside information, for which he received approximately $314,136,508 in proceeds. Defendant Botteri's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

120.    Defendant Sturdy also engaged in lucrative insider sales during the Relevant Period. On April 23, 2021, Defendant Sturdy sold 1,527,673 shares of Company common stock for $85,549,688 in proceeds. This transaction, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

121.    During the Relevant Period, while the Company's stock price was artificially inflated, and before the scheme was exposed, Defendant Wong made the following sales of Company stock:

| Date | Shares | Price | Value |
|---|---|---|---|
| April 23, 2021 | 5,219,883 | $56.00 | $292,313,448 |
| April 23, 2021 | 94,503 | $56.00 | $5,292,168 |
| August 25, 2021 | 40,000 | $63.20 | $2,257,960 |
| February 14, 2022 | 75,000 | $37.63 | $2,822,475 |
| February 18, 2022 | 75,000 | $37.81 | $2,835,750 |
| **Total:** | **5,504,386** | | **$305,791,801** |

122.    Thus, in total, before the fraud was exposed, he sold 5,504,386 shares of Company

stock on inside information, for which he received approximately $305,791,801 in proceeds. Defendant Wong's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

### Repurchases During the Relevant Period

123.     During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, UiPath spent an aggregate amount of ***over $10.5 million*** to repurchase approximately 185,932 shares of its own common stock at artificially inflated prices from April 2021 to March 2022.

124.     According to the Q1 22 Form 10-Q, between April 1, 2021 and April 30, 2021, the Company purchased 164,141 shares of its common stock for approximately $9,191,896 at an average price of $56.00 per share.[3] As UiPath's stock was actually worth only $21.59 per share, the price at closing on March 30, 2022, the Company overpaid by approximately $5,648,092 for repurchases of its stock between April 1, 2021 and April 30, 2021.

125.     According to the Q2 22 Form 10-Q, between May 1, 2021 and May 31, 2021, the Company purchased 907 shares of its common stock for approximately $72,397 at an average price of $79.82 per share. As UiPath's stock was actually worth only $21.59 per share, the price at closing on March 30, 2022, the Company overpaid by approximately $52,815 for repurchases of its stock between May 1, 2021 and May 31, 2021.

126.     According to the Q2 22 Form 10-Q, between June 1, 2021 and June 30, 2021, the Company purchased 2,291 shares of its common stock for approximately $155,628 at an average price of $67.93 per share. As UiPath's stock was actually worth only $21.59 per share, the price at

---

[3] Upon Information and belief, these shares were repurchased during the Relevant Period.

closing on March 30, 2022, the Company overpaid by approximately $106,165 for repurchases of its stock between June 1, 2021 and June 30, 2021.

127.    According to the Q2 22 Form 10-Q, between July 1, 2021 and July 31, 2021, the Company purchased 15,021 shares of its common stock for approximately $947,224 at an average price of $63.06 per share. As UiPath's stock was actually worth only $21.59 per share, the price at closing on March 30, 2022, the Company overpaid by approximately $622,921 for repurchases of its stock between July 1, 2021 and July 31, 2021.

128.    According to the Q3 22 Form 10-Q, between August 1, 2021 and August 31, 2021, the Company purchased 1,077 shares of its common stock for approximately $69,520 at an average price of $64.55 per share. As UiPath's stock was actually worth only $21.59 per share, the price at closing on March 30, 2022, the Company overpaid by approximately $46,268 for repurchases of its own stock between August 1, 2021 and August 31, 2021.

129.    According to the Q3 22 Form 10-Q, between September 1, 2021 and September 30, 2021, the Company purchased 2,495 shares of its common stock for $129,740 at an average price of $52.00 per share. As UiPath's stock was actually worth only $21.59 per share, the price at closing on March 30, 2022, the Company overpaid by approximately $75,873 for repurchases of its own stock between September 1, 2021 and September 31, 2021.

130.    Thus, in total, during the Relevant Period, UiPath overpaid for repurchases of its own stock by over $6.55 million.

## DAMAGES TO THE COMPANY

131.    As a direct and proximate result of the Individual Defendants' conduct, UiPath will lose and expend many millions of dollars.

132.    Such losses include the over $6.55 million the Company overpaid when it

repurchased its own common stock at artificially inflated prices during the Relevant Period before the fraud was exposed.

133.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

134.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

135.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

136.    As a direct and proximate result of the Individual Defendants' conduct, UiPath has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

137.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

138.    Plaintiff brings this action derivatively and for the benefit of UiPath to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of UiPath, gross mismanagement, abuse of control,

waste of corporate assets, unjust enrichment, violations of Section 10(b) and 20(a) of the Exchange Act, and the aiding and abetting thereof.

139.   UiPath is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

140.   Plaintiff is, and has been at all relevant times, a shareholder of UiPath. Plaintiff will adequately and fairly represent the interests of UiPath in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

141.   A pre-suit demand on the Board of UiPath is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following seven individuals: Defendants Dines, Botteri, Gordon, Springer, Sturdy, Wong (the "Director Defendants") and non-party Karenann Terrell . Plaintiff needs only to allege demand futility as to four of the seven members of the Board at the time of the filing of this complaint.

142.   Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, and, at the same time, to cause the Company to overpay by over $6.55 million for repurchases of its own stock while four of them engaged in insider sales, all of which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

143.   In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly caused or permitted the Company to issue the materially false and

misleading statements alleged herein. Specifically, the Director Defendants caused UiPath to issue false and misleading statements which were intended to make UiPath appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

144.     Additional reasons that demand on Defendant Dines is futile follow. Defendant Dines is the co-founder of the Company and has served as Chairman of the Board since October 2005. Moreover, since May 2022, he has served as Co-CEO of the Company. In addition, Defendant Dines holds over 86% of the voting power in the Company and is thus the controlling shareholder. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Dines with his principal occupation for which he receives significant compensation as detailed above. As Co-CEO, Defendant Dines is ultimately responsible for all the Company's false and misleading statements and omissions made during the Relevant Period, including those which he signed SOX certifications for in the Q1 22 Form 10-Q, Q2 22 Form 10-Q, and Q3 22 Form 10-Q. Additionally, Defendant Dines made a number of materially false and misleading statements in press releases and in conference earnings call to investors and analysts. Moreover, Defendant Dines engaged in lucrative insider trading and helped facilitate the scheme of the Board in overinflating the price of the Company's stock in order to make a substantial sum of money. During the Relevant Period and before the truth was revealed, Defendant Dines sold 1,428,910 shares of UiPath stock for $80.02 million. As one of the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor internal controls over reporting and

engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Further, Defendant Dines is a defendant in the Securities Class Action. For these reasons, Defendant Dines breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145.    Defendant Botteri has served as a director of the Company since February 2020. Defendant Botteri has received and continues to receive significant compensation for his role as a director as detailed above. Additionally, during the Relevant Period Defendant Botteri engaged in lucrative insider trading in which he sold 5,589,035 shares of Company common stock for $314,136,508 in total compensation. As a Company director, he conducted little if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant Botteri also serves as an associate at Accel, an investment firm which was one of the initial investors in UiPath and helped to bring it public. For these reasons, Defendant Botteri breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

146.    Defendant Gordon has served as a Company director since September 2020. Defendant Gordon has received and continues to receive significant compensation for his role as a director as detailed above. As a Company director, he conducted little if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, Defendant Gordon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and

thus demand upon him is futile and, therefore, excused.

147.    Defendant Springer has served as a Company director since March 2021. Defendant Springer has received and continues to receive significant compensation for his role as a director as detailed above. As a Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Springer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

148.    Defendant Sturdy has served as a Company director since March 2021. Defendant Sturdy has received and continues to receive significant compensation for her role as a director as detailed above. Additionally, during the Relevant Period, Defendant Sturdy engaged in lucrative insider trading in which she sold 1,527,673 shares of Company common stock for a return of $85,549,688. As such, she was an active participant in the scheme to artificially inflate the price of the Company's common stock at the IPO and substantially benefited from it. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Sturdy breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

149.    Defendant Wong has served as a Company director since March 2018. Defendant Wong has received and continues to receive significant compensation for his role as a director as

detailed above. Additionally, during the Relevant Period Defendant Wong engaged in lucrative insider trading in which he sold 5,504,386 shares of Company common stock for a return of $305,791,801. As such, he was an active participant in the scheme to artificially inflate the price of the Company's common stock at the IPO and substantially benefited from it. As a Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Wong is a partner at Accel, an investment firm which helped the Company go public and was an early investor. For these reasons, Defendant Wong breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile, and, therefore, excused.

150.    Each of the Director Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by over $6.55 million for its own common stock during the Relevant Period. The Director Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

151.    Defendants Gordon and Springer served as members of the Audit Committee for the entirety of the Relevant Period. In violation of the Audit Committee Charter, Defendants Gordon and Springer failed to adequately review and discuss the Company's Forms 10-Q which contained materially false and misleading statements. Additionally, Defendants Gordon and Springer failed to adequately exercise their risk management and risk assessment functions and

failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, Defendants Gordon and Springer further breached their fiduciary duties, are not disinterested or independent, and demand is futile, and therefore excused, as to them.

152.    In violation of the Code of Conduct, the Director Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Conduct, the Director Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

153.    UiPath has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for UiPath any part of the damages UiPath suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

154.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a

provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

155.    The acts complained of herein constitute violations of fiduciary duties owed by UiPath's officers and directors, and these acts are incapable of ratification.

156.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of UiPath. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of UiPath, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

157.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause UiPath to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

158.    Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least four of the Director Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## CLAIM I

**Against the Individual Defendants For Violations of §10(b) of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. §240.10b-5**

159.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

160.    The Individual Defendants participated in scheme to defraud with the purpose and effect of defrauding UiPath. Not only is UiPath now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon UiPath by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase 185,932 of its own shares at artificially-inflated prices, damaging UiPath.

161.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

162.    The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in

order to make the statements made about UiPath not misleading.

163.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by UiPath.

164.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

165.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

166.    Plaintiff, on behalf of UiPath, has no adequate remedy at law.

## CLAIM II

### Against the Individual Defendants for Violations of §20(a) of the Exchange Act, 15 U.S.C. § 78(t)

167.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

168.    The Individual Defendants, by virtue of their positions with UiPath and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of UiPath and each of its controlling shareholder, officers and directors who made the false and misleading

statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause UiPath to engage in the illegal conduct and practices complained of herein.

169.    Plaintiff, on behalf of UiPath, has no adequate remedy at law.

## CLAIM III

### Against the Individual Defendants for Breach of Fiduciary Duties

170.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

171.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of UiPath's business and affairs.

172.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

173.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of UiPath.

174.    In breach of their fiduciary duties owed to UiPath, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (a) the Company had implemented a substantial discounting program prior to its IPO, which had the effect of temporarily boosting UiPath's revenue and ARR metrics, cannibalizing its future sales, eroding UiPath's margins, and increasing the risk of client churn; (b) the Company's actual total addressable market was not as large as portrayed by Defendants, as many companies included in the market survey did not need

54

the type of high-cost, high-functionality automation products that UiPath offered; (c) the Company

was losing customers to competitors, including Microsoft, ServiceNow, SAP, Salesforce, IBM,

and other established enterprise software vendors that were integrating automation into their

existing platforms; (d) the Company was losing customers because of the increased availability of

low-code automation software offered by vendors, such as Microsoft's Power Automate software,

which were capable of addressing the majority of customer use cases at a fraction of the price of

the Company's products and services; (e) the Company was suffering from a loss of channel sales

due to strained relationships with its partners as a result of increased competition between UiPath

and these partners; (f) the Company failed to maintain internal controls; and (g) in light of the

above, the Defendants' statements about the Company's business, operations, and prospects were

materially false and misleading and/or lacked a reasonable basis at all relevant times.

175.    The Individual Defendants further failed to correct and/or caused the Company to

fail to correct the false and misleading statements and/or omissions of material fact, which renders

them personally liable to the Company for breaching their fiduciary duties.

176.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain

adequate internal controls.

177.    In yet further breach of their fiduciary duties, during the Relevant Period, the

Individual Defendants willfully or recklessly caused the Company to repurchase thousands of

shares of its own common stock at artificially inflated prices before the fraud was exposed, while

five of the Individual Defendants engaged in lucrative insider sales, netting proceeds of over $504

million.

178.    The Individual Defendants had actual or constructive knowledge that they had

caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to

maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of UiPath's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

179.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

180.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, UiPath has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

181.    Plaintiff, on behalf of UiPath, has no adequate remedy at law.

## CLAIM IV

### Against Individual Defendants for Abuse of Control

182.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

183.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence UiPath, for which they are legally responsible.

184.    As a direct and proximate result of the Individual Defendants' abuse of control, UiPath has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, UiPath has

sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

185.     Plaintiff, on behalf of UiPath, has no adequate remedy at law.

## CLAIM V

### Against Individual Defendants for Unjust Enrichment

186.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

187.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, UiPath.

188.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from UiPath that was tied to the performance or artificially inflated valuation of UiPath or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

189.     Plaintiff, as a shareholder and a representative of UiPath, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

190.     Plaintiff, on behalf of UiPath, has no adequate remedy at law.

## CLAIM VI

### Against Individual Defendants for Waste of Corporate Assets

191.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth

above, as though fully set forth herein.

192.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

193.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused UiPath to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

194.    In addition, the Individual Defendants caused the Company to repurchase thousands of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

195.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

196.    Plaintiff, on behalf of UiPath, has no adequate remedy at law.

## CLAIM VII

### Against Individual Defendants for Gross Mismanagement

197.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

198.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of UiPath in a manner consistent with the operations of a publicly held corporation.

199.    As a direct and proximate result of the Individual Defendants' gross

mismanagement and breaches of duty alleged herein, UiPath has sustained and will continue to sustain significant damages.

200.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

201.    Plaintiff, on behalf of UiPath, has no adequate remedy at law.

## CLAIM VIII

**Against Defendants Dines and Gupta for Contribution
Under §10(b) and §21D of the Exchange Act**

202.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

203.    UiPath and Defendants Dines and Gupta are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Dines's and Gupta's willful and/or reckless violations of their obligations as controlling shareholder, officers and/or directors of UiPath.

204.    Defendants Dines and Gupta, because of their positions of control and authority as controlling shareholder, officers and/or directors of UiPath, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of UiPath, including the wrongful acts complained of herein and in the Securities Class Action.

205.    Accordingly, Defendants Dines and Gupta are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising

out of violations of the Exchange Act.

206.    As such, UiPath is entitled to receive all appropriate contribution or indemnification from Defendants Dines and Gupta.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of UiPath, and that Plaintiff is an adequate representative of the Company;

B.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

C.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

D.    Awarding UiPath restitution from the Individual Defendants, and each of them;

E.    Awarding punitive damages;

F.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.    Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: December 8, 2023

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Erica L. Stone
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
Email: estone@rosenlegal.com

Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Fax: (302) 777-0301
Email: bfarnan@farnanlaw.com
Email: mfarnan@farnanlaw.com

*Counsel for Plaintiff*